**Clarence "Butch" PENNINGTON, and Sherri J. Pennington, Plaintiffs,**

v.

**Steven C. TEUFEL, et al., Defendants.**

**Civil Action No. 3:05CV04.**

United States District Court, N.D. West Virginia, Martinsburg Division.

Aug. 26, 2005.

---

8.  *See supra* Part I. for a review of these factu-    al allegations.

Christopher P. Stroech, Richard L. Douglas, Law Office of Richard L. Douglas, PLLC, Martinsburg, WV, for Plaintiffs.

Brian M. Peterson, Michael D. Lorensen, Bowles Rice McDavid Graff & Love, LLP, Martinsburg, WV, for Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION TO STRIKE

BROADWATER, District Judge.

#### I. Introduction

On this day, the above styled matter came before the Court for consideration of Defendants' motion to dismiss the amended complaint and Plaintiffs' motion to strike. For the reasons set forth below, Defendants' motion is **GRANTED** and Plaintiffs' motion to strike is **DENIED**.

#### II. Procedural History

On February 7, 2005, Plaintiffs, Clarence Pennington and Sherri Pennington, filed an Amended Complaint [1] in this Court against Defendants, the Berkeley County Planning Commission ("Planning Commission"), and eight of its members individually, Steven Teufel, Karen Wood, Robert Butler, Jim Whitacre, Gary Poling, Lee Samsell, Tony Petrucci [2], and Ray Brosius, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated Plaintiffs' right to due process under the Fourteenth Amendment to the United States Constitution under

---

1. Doc. No. 3.

2. Mr. Petrucci was dismissed without prejudice by notice filed February 16, 2005. *See* Doc. No. 13.

color of state law. On February 22, 2005, Defendants filed a motion to dismiss.[3] Plaintiffs filed a motion to strike Defendants' motion to dismiss on March 4, 2005,[4] and Defendants filed a response to the motion to strike on March 18, 2005.[5] On May 19, 2005, the Court scheduled oral argument on the motions for June 28, 2005.[6] A week before the hearing, on June 20, 2005, Plaintiffs filed a response in opposition to Defendants' motion to dismiss.

On June 28, 2005, the Court held a hearing to address Defendants' motion to dismiss and Plaintiffs' motion to strike. Following the hearing, Plaintiffs filed a supplemental response to the Defendants' motion to dismiss.[7] Now before the Court are Defendants' motion to dismiss and Plaintiffs' motion to strike. The Court has considered the parties' memoranda and the applicable law on point; thus, the motions are ripe for decision.

### III.   Facts

This case arises out of a denial by the Planning Commission of final plat approval for Plaintiffs' commercial development called Big Apple Plaza, which is located near Inwood, Berkeley County, West Virginia. According to the allegations of the amended complaint, Plaintiffs' proposed commercial subdivision, "Big Apple Plaza," was to contain, among other things, "a liquor store and video lottery machines[.]" In accordance with the Berkeley County Subdivision Regulations (the "Subdivision Regulations"), Plaintiffs submitted a preliminary plat for approval on April 9, 2004 to the Planning Commission. At a public hearing regarding the subdivision plat, held in accordance with the Subdivision

Regulations on May 3, 2004, local citizens "spoke out against the aspects of the project which included alcohol sales and video lottery machines." Am. Compl. at ¶ 24. The Planning Commission tabled the May 3, 2004, discussions until May 17, 2004, in order to obtain an opinion from its legal counsel regarding the effect of a deed restriction in the chain of title to the property on which the proposed project was to be built. On May 13, 2004, the Planning Commission received an opinion from its legal counsel advising it not to consider potential deed restrictions in evaluating whether to approve or deny Plaintiffs' application for preliminary plat approval. The Planning Commission denied preliminary plat approval for Big Apple Plaza, stating in a letter to Plaintiffs dated May 18, 2004, that the reason for the denial was "inconsistencies in the legal documents associated with the subdivision." *Id.* at ¶ 27. Plaintiffs contend this reasoning was "pretextual and disingenuous," and that the decision actually was "based upon public opinion and emotional aspects."

Plaintiffs challenged the Planning Commission's decision by petition for writ of certiorari filed with the Circuit Court of Berkeley County, West Virginia, on June 4, 2004. By letter dated June 15, 2004, the Planning Commission revised its justification for denying preliminary plat approval, this time stating that the denial was based on Section 105 of the Subdivision Regulations, which reads in pertinent part that "[t]hese subdivision regulations are adopted by the County Commission of Berkeley County, West Virginia, for the following purposes ... [t]o promote the health and safety of the residents of Berkeley County." Subdivision Regula-

---

**3.** Doc. No. 14.

**4.** Doc. No. 17.

**5.** Doc. No. 18.

**6.** *See* Order, Doc. No. 22.

**7.** Doc. No. 30.

tions, Section 105(f). By Order dated August 2, 2004, the Circuit Court of Berkeley County found that the Planning Commission acted outside its jurisdiction in denying preliminary plat approval for Plaintiffs' subdivision, and it ordered the Planning Commission to grant preliminary plat approval. The Planning Commission did not appeal the circuit court's ruling.

In their single-count amended complaint, Plaintiffs claim that the Defendants' denial of their plat caused them "administrative delay" which deprived them of their Fourteenth Amendment right to Due Process in violation of 42 U.S.C. § 1983. They seek to recover various compensatory damages including lost profits, attorney's fees and costs associated with their state court proceedings, other compensatory damages, punitive damages, and attorney's fees and costs.

### IV. Applicable Law

■■■ "A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.1992) (citing 5B C. Wright & A. Miller, *Fed. Practice and Procedure* § 1356 (1990)). "A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of [the subject] claim." *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 328 (4th Cir.1996) (citing *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989)). When re-

viewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir.1999). When rendering its decision, the Court should consider only the allegations contained in the complaint, the exhibits to the complaint, matters of public record, and other similar materials that are subject to judicial notice. *Anheuser–Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1314 (4th Cir.1995).

### V. Discussion

Defendants seek dismissal of the case based on the following grounds: (1) Plaintiffs have no cognizable property interest in the plat approval they sought, (2) Plaintiffs had an adequate post-deprivation remedy available to them; (3) the *Rooker–Feldman* doctrine bars the claim; and (4) the individual Defendants are entitled to qualified immunity.

### A. Plaintiffs lack a property interest in plat approval

■■ In order to make out a claim for violation of Fourteenth Amendment due process, Plaintiffs must show that they had a property interest in preliminary plat approval and that Defendants denied that property interest without affording them due process of law. Defendants assert that the Plaintiffs' claim fails because Plaintiffs cannot show they had a protected property interest in the approval of their subdivision plans under the Berkeley County Subdivision Regulations.[8]

---

**8.** Materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss without converting the motion to a motion for summary judg-

ment. *Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The Subdivision Regulations is a public document referenced and relied upon extensively in the Amended Complaint. Therefore, the

The facts of this case are similar to those of *Gardner v. City of Baltimore,* 969 F.2d 63 (4th Cir.1992). In *Gardner,* the Plaintiffs landowners brought suit against city officials under 42 U.S.C. § 1983, claiming that the city officials, under pressure from influential residents, improperly prevented the landowners from securing necessary approvals for residential development of their property. The landowners contended that the city officials violated their Fourteenth Amendment substantive and procedural due process rights. The district court granted summary judgment to the city officials, finding that the landowners did not have a protected property interest, and the landowners appealed.

The Fourth Circuit pronounced that as a general rule federal courts should refrain from interfering in local land use matters:

> Resolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials is simply not the business of the federal courts. There is no sanction for casual federal intervention into what has always been an intensely local area of the law ... Federal judges lack the knowledge of and sensitivity to local conditions necessary to a proper balancing of the complex factors that are inherent in municipal land-use decisions. Further, allowing every allegedly arbitrary denial by a town or city of a local license or permit to be challenged under Section 1983 would swell [ ] our already overburdened federal system beyond capacity. Accordingly, federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes. Section 1983 does not empower us to sit as a super-planning commission or a zoning board

of appeals, and it does not constitutionalize every run of the mill dispute between a developer and a town planning agency. In most instances, therefore, decisions regarding the application of subdivision regulations, zoning ordinances, and other local land-use controls properly rest with the community that is ultimately— and intimately—affected.

*Gardner,* 969 F.2d at 67–68 (citations and internal quotations omitted).

The court went on to recite the fundamental principle that the Fourteenth Amendment itself does not create property interests but rather protects property interests "stemming from an independent source such as state law...." *Id.* at 68 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The court further stated: "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* (citation omitted).

Other courts have strictly defined what constitutes a "legitimate claim of entitlement" in the land use context, and in *Gardner* the Fourth Circuit followed their approach. Thus, the court opined that a property owner may be said to possess a legitimate claim of entitlement to the granting of a permit only if under the applicable state or municipal law:

> The local agency lacks all discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest. Under this standard, a cognizable prop-

Court may consider the Subdivision Regulations without converting the Defendants' mo-

tion into a motion for summary judgment.

erty interest exists only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured.... Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of a local agency to deny issuance suffices to defeat the existence of a federally protected property interest.

969 F.2d at 68 (citations and internal quotations omitted).

In *Gardner*, the Fourth Circuit found that the role of Baltimore's planning commission, under the City's subdivisions regulations, "was more than merely ministerial" where the commission had "significant discretion to reject even properly submitted applications." *Id.* at 69. The same type of discretion is present in the Berkeley County Subdivision Regulation, which affords the same type of discretion to the Berkeley County Planning Commission. Regarding preliminary plat approval, the Subdivision Regulations provide as follows:

(f) After the public hearing, the Planning Commission shall proceed to the consideration of the Preliminary Plat. The Planning Commission shall consider the comments and opinions expressed at the public hearing **but the Planning Commission shall be responsible for reaching its own conclusions on the merits of the proposed Subdivision or Land Development Unit project.**

(g) In determining whether approval should be given to the Preliminary Plat, the Planning Commission **shall be guided** by the design standards set forth in this Ordinance. Particular attention shall be given to the arrangement, location and width of streets and their relation to the topography, water supply, sewage and solid waste disposal, drainage, erosion and sediment control, lot sizes and arrangements, the future development of adjoining lands not yet subdivided, the Goals, Policies, and Recommendations of the Berkeley County Comprehensive Development Plan, the Statement of Legislative Intent and the Statement of Purpose of this Ordinance.

(h) Following review of the Preliminary Plat and other material submitted for conformity with these regulations, review of written comments from other agencies and discussions with the subdivider on changes deemed advisable, if any, and the kind and extent of improvements to be made by him, **the Planning Commission shall,** within forty-five (45) days after commencing of the public hearing, **approve or disapprove the Preliminary Plat.** If approved, the Planning Commission shall state the conditions of such approval, if any. If disapproved, the Planning Commission shall express its reasons for disapproval in writing.

Subdivision Regulations, § 403.2(f)-(h) (emphasis added).

Subsection (g) offers nothing more than guidance to the Planning Commission and does not constitute a substantial limitation on its discretion. Among the purposes of the Ordinance contained in the "Statement of Purpose" is "[t]o promote the health and safety of the residents of Berkeley County." *Id.* at § 105. Thus, even at the preliminary plat approval stage, the Planning Commission has wide discretion to approve or deny a project for reasons it believes promote the health and safety of the residents of Berkeley County.

A grant of broad discretion is also afforded in the Final Plat Approval section. Section 404.2 of the Subdivision Regulations, providing the general procedure for final plat review and approval of major subdivisions, simply states "[t]he Planning Commission shall review the Final Plat

and within forty-five (45) days of the meeting at which the Final Plat is first considered, the Planning Commission shall approve, modify and approve, or disapprove such plat." *Id.* at § 404.2. This provision is devoid of any substantive criteria to be used by the Planning Commission to evaluate the sufficiency of the plans. Through this provision the Planning Commission is granted broad discretion, and it clearly "retains significant discretion to reject submitted final plans." *Gardner,* 969 F.2d at 69. Thus, the Subdivision Regulations grant the Planning Commission substantial discretion at both the preliminary plat approval stage and the final plat approval stage.

Because the Subdivision Regulations vest broad discretion with the Planning Commission throughout the stages of the process, Plaintiffs had no legitimate claim of entitlement to the regulatory approval of their subdivision, Big Apple Plaza. Because they did not possess any property interest cognizable by the Fourteenth Amendment's Due Process Clause, their Section 1983 action necessarily fails.

B. Plaintiffs had an adequate post-deprivation remedy

■ Even if the Court were to find that Plaintiffs had a protectable property interest in obtaining plat approval, their claim would nevertheless be dismissed because state law provides adequate post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). As Plaintiffs point out in their Amended Complaint, the West Virginia Code provides that "[a] decision of a commission may be reviewed by certiorari procedure" to the "circuit court of the county in which the affected land ... is located...." W. Va.Code § 8–24–38 (2003). The fact that Plaintiffs used this procedure to obtain a speedy reversal of the Planning Commission's decision and their desired permit shows that this post-deprivation remedial procedure is indeed effective. *See Sylvia Dev. Co. v. Calvert County,* 48 F.3d 810, 829 (4th Cir.1995) (stating that "the fact that established state procedures were available to address and correct illegal actions by the Board belies the existence of a substantive due process claim.").

C. Plaintiffs' claims are barred by the Rooker–Feldman doctrine.

Defendants also argue that the Court lacks jurisdiction over this case under the United States Supreme Court's decisions in *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Specifically, because Plaintiffs' claims and those issues inextricably intertwined therewith, or both, have been decided by the state courts, the Court lacks jurisdiction over this matter. The decisions in *Rooker* and *Feldman,* taken together, stand for the proposition that the inferior federal courts lack the authority to perform, in effect, an appellate review of state court decisions. *Rooker,* 263 U.S. at 414, 44 S.Ct. 149; *Feldman,* 460 U.S. at 462, 103 S.Ct. 1303. This now well-settled rule has become known as the "*Rooker–Feldman* Doctrine."

■ The administrative proceedings before the Berkeley County Planning Commission are reviewable in state court for all the legal grounds now asserted. A United States District Court has no authority to review final judgments of a state court in judicial proceedings. Jurisdiction to review such decisions lies exclusively with superior state courts and, ultimately, the United States Supreme Court. *Plyler v. Moore,* 129 F.3d 728, 731 (4th Cir.1997).

■ The *Rooker–Feldman* doctrine bars not only direct review of issues actually decided by the state court, but also consideration of those claims which are "inextricably intertwined" with state court decisions. *Feldman,* 460 U.S. at 486–87, 103 S.Ct. 1303; *Plyler,* 129 F.3d at 731. The "inextricably intertwined" element of the doctrine bars a claim that was not actually decided by the state court but where "success on the federal claim depends upon a determination that the state court wrongly decided the issues before it." *Plyler,* 129 F.3d at 731 (internal quotations omitted). Under either the "actually decided" or the "inextricably intertwined" prong, the principle is the same: "[a] party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy,* 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).

■ "[T]he *Rooker–Feldman* doctrine precludes not only review of adjudications of the state's highest court, but also the decisions of its lower courts." *Jordahl v. Democratic Party of Virginia,* 122 F.3d 192, 199 (4th Cir.1997); *accord, FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996) (stating that "[w]e have interpreted the doctrine to encompass final decisions of lower state courts."). "The *Rooker–Feldman* doctrine is in no way dependent upon the temporal procedural posture of the state court judgment." *Jordahl,* 122 F.3d at 202. "Rather, the doctrine reinforces the important principle that review of state court decisions must be made to the state appellate courts, and eventually to the Supreme Court, not by federal district courts or courts of appeal." *Id.*

The rationale behind the *Rooker–Feldman* doctrine was summarized in *Brown & Root, Inc. v. Breckenridge,* 211 F.3d 194 (4th Cir.2000). In *Breckenridge,* the Fourth Circuit stated:

*Rooker–Feldman* is one of a number of doctrines that safeguards our dual system of government from federal judicial erosion. The independence of state courts would surely be compromised if every adverse decision in state court merely rang the opening bell for federal litigation of the same issues. Even more fundamentally, the *Rooker–Feldman* doctrine is rooted in the principle of separation of powers. It rests on two basic propositions of federal jurisdiction. First, Congress has vested the authority to review state court judgments in the United States Supreme Court alone. The *Rooker–Feldman* doctrine thus interprets 28 U.S.C. § 1257 as ordinarily barring direct review in the lower federal courts of a decision reached by the highest state court, for such authority is vested solely in [the Supreme] Court. Second, Congress has empowered the federal district courts to exercise only original jurisdiction. While the lower federal courts were given certain powers in the [Judiciary Act of 1789], they were not given any power to review directly cases from state courts, and they have not been given such powers since that time. And it is well settled that Congress has the constitutional authority to define the jurisdiction of the lower federal courts.

*Id.* at 198–99 (citations and internal quotations omitted).

■ To summarize, an inferior federal court must apply the *Rooker–Feldman* Doctrine to dismiss cases for lack of jurisdiction where: "(1) the party against whom the Doctrine is being applied had the opportunity to raise the issues pending

before the federal court in the instant case, or those inextricably intertwined therewith, in a prior state court proceeding; and (2) these issues, or those inextricably intertwined therewith, were adjudicated in the prior state court proceeding." *Cmty. Treatment Ctrs., Inc. v. City of Westland,* 970 F.Supp. 1197, 1214 (E.D.Mich.1997).

In the instant case, Plaintiffs had the opportunity to raise the issues pending before this court (and those inextricably intertwined therewith) in their state court proceeding. According to state law, "[a] decision of a commission may be reviewed by certiorari procedure[.] ... A petition for certiorari shall specify the grounds upon which it is alleged that the commission's action is illegal. Such petition must be filed in the circuit court of the county in which the affected land or the major portion thereof is located...." W. Va.Code § 8–24–38 (2003). Circuit courts in West Virginia are courts of general jurisdiction. State courts as well as federal courts have jurisdiction over § 1983 cases. *Howlett v. Rose,* 496 U.S. 356, 359, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). Plaintiffs were free to raise any constitutional infirmities with the application of the ordinance or any other violation of state or federal law in their state court action. *See* W. Va. R. Civ. P. 71B ("A plaintiff may join a demand for relief which encompasses different types of writs and other types of relief.") Plaintiffs were also entitled to seek attorney fees and costs associated with their certiorari complaint. Therefore, the first prong of the *Rooker–Feldman* doctrine is met.

Having had the opportunity to raise in the state judicial proceeding the issues that they bring before this Court, Plaintiffs effectively ask this Court to adjudicate issues, or those inextricably intertwined therewith, which the state court has already decided. The issues involved in the present case are clearly inextricably

intertwined with the issues adjudicated in state court. Plaintiffs' claim of violation due process requires an analysis of whether the Planning Commission's denial "ha[d] no foundation in reason and [was] a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in the proper sense." *Sylvia Dev.,* 48 F.3d at 828. Such a claim, though not raised in the state action, is inextricably intertwined with the issues addressed by the Circuit Court of Berkeley County, which determined that the Planning Commission acted outside its authority under the Ordinance. As the Amended Complaint states, "[i]n an Order dated August 2, 2004, the Circuit Court of Berkeley County found, that in denying Plaintiffs' application for preliminary plat approval, the Planning Commission applied an erroneous principle of law, was plainly wrong in its factual finding, and as a result acted beyond its jurisdiction." Am. Compl. at ¶ 31. Thus, it is clear that Plaintiffs' constitutional claim is inextricably intertwined with the issues adjudicated in state court.

In addition, one of the primary remedies sought by Plaintiffs in this action—their attorney fees associated with their state court appeal—was considered and denied by the state court judge. This Court, as an inferior federal court, simply lacks jurisdiction to revisit issues such as these that already have been (or could have been) decided by the state courts. Cases such as the instant case are in their essence state law cases. *Front Royal and Warren County Indus. Park v. Front Royal,* 135 F.3d 275 (4th Cir.1998); *Sylvia Dev.,* 48 F.3d at 810; *Greenspring Racket Club, Inc., v. Baltimore Co.,* Nos. 99–2444, 00–1012, 2000 WL 1624496 (4th Cir. Oct.31, 2000) (unpublished). Accordingly, the Court lacks jurisdiction over this case,

and must dismiss the suit with prejudice for lack of jurisdiction pursuant to the *Rooker–Feldman* Doctrine.

### D. The individual Defendants are entitled to qualified immunity

Defendants also urge dismissal of the individual Defendants on the qualified immunity recognized in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because Plaintiffs have not alleged and cannot show that any of these Defendants violated any clearly established federal law, the Court agrees that the individual Defendants are entitled to qualified immunity.

The United States Supreme Court has recognized that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In the seminal case of *Harlow v. Fitzgerald*, the Supreme Court held that:

> We conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. 2727. Thus, federal courts provide "government officials performing discretionary functions with qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 483 U.S. at 638, 107 S.Ct. 3034 (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The scope of the immunity is broad, protecting "all but the official who is plainly incompetent, or knowingly violates the law." *Malley*, 475 U.S. at 344–45, 106 S.Ct. 1092.

The Supreme Court has directed that "qualified immunity questions should be resolved at the earliest possible stage of litigation." *Smith v. Reddy*, 101 F.3d 351, 357 (4th Cir.1996) (citing *Anderson*, 483 U.S. at 646 n. 6, 107 S.Ct. 3034). As the Fourth Circuit explained, the reason that qualified immunity questions should be resolved early is because:

> Qualified immunity is an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial. Even such pretrial matters as discovery are to be avoided, if possible, as inquiries of this kind can be peculiarly disruptive of effective government. Accordingly, qualified immunity should be addressed at the pleading or summary judgment stage whenever possible.

*Id.* (citations and internal quotations omitted).

In this case, Plaintiffs claim one constitutional violation—that by denying approval of their subdivision plat, Defendants violated their right to Due Process under the Fourteenth Amendment. The Fourth Circuit, when considering the application of *Harlow* and in determining what is "clearly established law" has required Plaintiffs to articulate that the individual defendant transgressed a bright line rule. In *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994), a social worker reported an injury to a child as suspected abuse. As it turned out, the injury was convincingly demonstrated to have been from a source

other than abuse. Nevertheless, the social worker refused to expunge the record of suspected abuse and the aggrieved parents sued. The district court ruled that the social worker was not entitled to qualified immunity because of the "family right to privacy". The Fourth Circuit reversed, holding that "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* at 167 (citing *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992)). The social worker was entitled to qualified immunity.

■ In determining whether the specific constitutional right allegedly violated was "clearly established," "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992) (citations omitted). Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." *Maciariello,* 973 F.2d at 298 (citing *Tarantino v. Baker,* 825 F.2d 772, 774–75 (4th Cir.1987)); *see also Wiley v. Doory,* 14 F.3d 993, 995 (4th Cir.1994). The Fourth Circuit has noted that there are often "legitimate questions" as to whether a government official's conduct violates someone's constitutional rights. *Tarantino,* 825 F.2d at 775. When such a legitimate question exists, the principle of qualified immunity gives public officials the necessary latitude to pursue their duties "without having to anticipate, on the pain of civil liability, future refinements or clarifications of constitutional law." *Id.* Thus, the Fourth Circuit has held that "[i]f there is a legitimate question as to whether an official's conduct violated the Plaintiffs's constitutional rights, the official is entitled to qualified immunity." *Doory,* 14 F.3d at 995 (citing *Tarantino,* 825 F.2d at 775).

Once the Defendants have raised the defense of qualified immunity,

> The Plaintiff then has the burden to show with particularity facts and law establishing the inference that the Defendants violated a constitutional right. This burden is quite heavy, for the Plaintiffs must do more than simply allege the violation of a general legal precept. The Plaintiffs must instead demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Only if the Plaintiffs makes that threshold showing does the burden shift to Defendants to show that no material facts remain in dispute that would defeat defendant's claim of qualified immunity.

*Watson v. Univ. of Utah Med. Ctr.,* 75 F.3d 569 (10th Cir.1996). Defendants properly raised the qualified immunity defense in their motion to dismiss. *See Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (noting that the qualified immunity defense can be raised in a motion to dismiss); *Sales v. Grant,* 224 F.3d 293, 301 (4th Cir.2000) (stating that "[a] defendant may first raise a qualified immunity defense at the pleadings stage in a motion to dismiss, and 'unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery' ") (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

At oral argument, Plaintiffs' counsel was unable to articulate any bright line rule the Defendants collectively or individually transgressed. Plaintiffs' Amended Com-

plaint states that the individual Defendants voted against their project "based upon public opinion and emotional aspects." Am. Compl. at ¶ 27. As the Fourth Circuit held in *Gardner*, "[t]hose who live near proposed development have the most significant personal stake in the outcome of land-use decisions and are entitled, under our system of government, to organize and exert whatever political influence they might have. Nor is it necessarily improper for municipal government to consider or act upon such political pressure. Such give-and-take between government officials and an engaged citizenry is what democracy is about." 969 F.2d at 71.

In their supplemental brief, Plaintiffs cited additional authorities which they contend established a bright line rule violated by the Defendants. The cases of *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) and *Pathways v. Town of Leonardtown*, 223 F.Supp.2d 699, 714 (D.Md.2002) both involved government officials taking action against people with disabilities based on prejudice that the citizenry may harbor against them. The present case does not involve public prejudice against persons with disabilities. Thus, these cases do not establish any bright line rule applicable here.

Plaintiffs also cite *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996) as putting Defendants on notice that their actions were unlawful. However, in that case, "the Plaintiff's only claim [was] that the process for his building permit was delayed illegally." *Id.* at 156, 479 S.E.2d 649. Because *Hutchison* did not involve the denial of a requested permit, it could establish no bright line rule applicable to this case. Finally, Plaintiffs cite *Marks v. City of Chesapeake, Virginia*, 883 F.2d 308 (4th Cir.1989) to support their position that Defendants violated a

bright line rule. In *Marks*, the city council had initially indicated that the Plaintiffs, a palm reader, would be granted a conditional use permit to operate a palmistry in an area zoned for residential use. However, after a number of residents expressed opposition to the palmistry on religious grounds, Plaintiffs's permit was denied. As the court noted, "[w]ith but one exception, Marks' opponents offered 'religious' reasons for withholding the permit—claiming, for example, that palmistry was 'contrary to the Bible and what the Bible teaches.'" *Id.* at 313. After a bench trial, the district court held that the Chesapeake City Council's denial of Plaintiffs's application for the permit was "arbitrary and capricious," hence a deprivation of property without due process of law. On appeal, the Fourth Circuit affirmed. It noted that the city's denial of the conditional use permit violated due process because it was "solely in an effort to placate those members of the public who expressed 'religious' objections to the Plaintiffs's proposed use of his property." *Id.* at 312.

The allegations of Plaintiffs in the present case, however, stand in contrast to those in *Marks*. Plaintiffs here do not claim that public opposition was based "solely on religious grounds." Instead, Plaintiffs allege that the "citizens spoke out against the aspects of the project which included alcohol sales and video lottery machines," and that the Defendants decision was "based on public opinion and emotional aspects," rather than purely religious aspects. Am. Compl. at ¶¶ 24, 27. In *Gardner*, which was decided several years after *Marks*, the Fourth Circuit held that it is not "necessarily improper for municipal government to consider or act upon. . . . political pressure [from concerned citizens]. Such give-and-take between government officials and an engaged citizenry is what

democracy is about." 969 F.2d at 71. As the Fourth Circuit noted in *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir.2003), "[i]n deciding whether the right alleged to have been violated was clearly established, the right must be defined 'at a high level of particularity.'" The rule set out in *Marks* prohibiting zoning authorities from denying permits based "solely in an effort" to placate those members of the public who expressed "religious objections" to a proposed use of property does not clearly establish the right allegedly violated in this case.

Therefore, qualified immunity is appropriate in this case and Defendants Steven Teufel, Karen Wood, Robert Butler, Jim Whitacre, Gary Poling, Lee Samsell, and Ray Brosius should be dismissed from the case.

E. Defendants' motion to dismiss is procedurally proper

Plaintiffs' Motion to Strike asserts that it is inappropriate for Defendants to file a Rule 12(b) motion to dismiss without also filing an answer. However, Rule 12(b) plainly states that "[e]very defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto, if one is required, *except that the following defenses may at the option of the pleader be made by motion.*" Fed.R.Civ.P. 12(b) (emphasis added.) Among those defenses that may be asserted by motion before a responsive pleading are "lack of jurisdiction over the subject matter," "lack of jurisdiction over the person" and "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(1), (2), (6). Because Defendants' motion to dismiss asserts lack of jurisdiction under *Rooker–Feldman*, qualified immunity for the individual Defendants, and failure to state a claim upon which relief can be granted, no answer would be due unless and until the court denies the motion or expressly declines to rule until later in the case. Fed. R.Civ.P. 12(a). Therefore, Plaintiffs' motion to strike Defendants' motion to dismiss must be denied.

VI. Decision

It is therefore **ORDERED** that:

1. Defendants' Motion to Dismiss (**Docket number 14**) be, and is hereby, **GRANTED;**

2. Plaintiffs' Motion to Strike (**Docket number 17**) be, and is hereby **DENIED;** and

3. This action be, and is hereby, **DISMISSED WITH PREJUDICE** and **STRICKEN** from the active docket of this Court.